*836 TEXTO COMPLETO DE LA SENTENCIA
El Municipio de Carolina nos solicita que revoquemos una sentencia del Tribunal de Primera Instancia, Sala Superior de Carolina, que determinó que era responsable por negligencia en un cincuenta porciento (50%) y el Estado Libre Asodado de Puerto Rico (ELA) en el restante cincuenta porciento (50%), por los daños ocasionados a la parte apelada Juan Concepción Corchado, et ais., en una demanda en daños y perjuicios por violación a derechos civiles.
Alega en síntesis que erró el tribunal de instancia, primero, al aquilatar la prueba presentada adjudicándole responsabilidad al Municipio de Carolina y no aplicar negligencia comparada; y segundo, en la valorización de daños, imponiéndole una cuantía exageradamente alta.
Vencido el plazo de los coapelados para presentar sus alegatos, éstos no comparecieron, por lo que el recurso quedó sometido. Así, se confirma la sentencia.
I
Los hechos según fueron determinados por el Tribunal de Primera Instancia tienen sus inicios el 6 de mayo de 1996, cuando la parte apelada presentó demanda sobre violación de derechos civiles, arresto ilegal, daños y perjuicios e interdicto permanente contra el Municipio de Carolina y el ELA. Alegó que agentes y funcionarios de la Policía de Puerto Rico y la Policía Municipal de Carolina, le causaron daños al arrestar a Juan M. Concepción Corchado sin motivos fundados, detenerlo ilegalmente, amenazarlo, usar fuerza excesiva e injustificada agrediéndolo físicamente, al radicarle y procesarlo por cargos criminales, expulsarlo de la Policía de Puerto Rico y dañarle su reputación e imagen como agente. (Ap. 1, págs. 1-26.)
La señora Carmen E. Concepción Corchado declaró que el día de los hechos, el 6 de mayo de 1996, como a las 9:00pm, se encontraba en su residencia en la calle 414 Bloque 146 #7, 4ta Extensión de Villa Carolina, cuando escuchó unos disparos, salió de su hogar y se dirigió a donde vio que se dirigían otras personas. Al llegar al lugar de los hechos, observó que habían otras personas, su hermano el señor Juan M. Concepción Corchado, una patrulla municipal y dos (2) guardias municipales. Su hermano Juan Concepción Corchado estaba bocabajo esposado en el piso. Luego llegaron varios guardias estatales y municipales, atravesaron el parque, se bajaron con armas largas y comenzaron a agredir y patear a su hermano que estaba esposado en el piso: Añadió que el guardia municipal de Carolina Samuel Joubert Negrón, quien no tenía su uniforme puesto, le decía malas palabras a su hermano. (E.E.P., págs. 2,4-7.)
Declaró que estaba con ella la esposa de Juan M. Concepción Corchado, la señora Virginia Rivera Quiara, con su bebé en los brazos y ambas trataron de conocer lo que estaba pasando, pero no las dejaron acercarse. Los *837 guardias las empujaban hacia atrás y su cuñada recibió un impacto fuerte mientras sostenía el bebé en los brazos. Sólo la guardia estatal Melissa Sepulveda les dijo que se quedaran tranquilas, que ellos eran oficiales y sabían lo que estaban haciendo. Luego de una discusión entre los oficiales, se llevaron a su hermano en la patrulla municipal al polígono Municipal de Carolina. Ella siguió en otro carro a las patrullas, preocupada por los incidentes que estaban ocurriendo. Primero sentaron a su hermano en la patrulla municipal y luego lo cambiaron a una patrulla estatal. Entre el cambio de una patrulla a otra, continuaron dándole una paliza y observó cuando el guardia municipal, a quien identificó como uno de los presentes en sala, le propició un puño en la cara. (E.E.P., págs. 3, 5, 7.)
En la primera parada que hizo la patrulla en el pentágono de Carolina, estuvieron como diez (10) o quince (15) minutos y dejaron a su hermano en la patrulla. Que ella se sentó en un banquito con el bebé y observó que la señora Rivera Quiara, esposa del arrestado, estaba hablando con el agente Pizarro, pero no sabe de qué hablaron. Mientras la señora Concepción esperaba en el banquito, el guardia municipal Samuel Joubert Negrón se le sentó al lado y le dijo “yo le dispar€\ refiriéndose al arrestado. Esta le respondió que si él sabía lo que estaba diciendo porque ella era su hermana y el guardia municipal se fue. (E.E.P., págs. 3-4, 6.)
Luego se dirigieron a la Estación A de la Policía Estatal camino a Río Grande, en donde bajaron al arrestado de la patrulla y lo encarcelaron. La señora Concepción Corchado declaró que luego de encarcelarlo, tanto los guardias municipales como los estatales entraron a mofarse de él y no le permitieron acercarse a su hermano. Sin embargo, aclaró que desde el lugar donde estaba sentada no podía ver la celda donde estaba su hermano. Esta permaneció allí hasta el día siguiente, el 7 de mayo, y a las 7:00am se fue a su casa. Cuando regresó a la Comandancia al mediodía, su hermano no estaba, por lo que regresó más tarde en la noche y tampoco dio con él. Los guardias le dijeron que lo habían “fichado” y no la dejaron verlo. (E.E.P., págs. 4-6.)
No fue hasta el día después, el 8 de mayo a las 2:30am, cuando vio nuevamente a su hermano. La señora Concepción Corchado declaró que cuando su hermano llegó a su casa, estaba “como si no estuviera en este planeta”, estaba “ido”, pensativo y lloró con su esposa. También tenía golpes en el lado derecho del rostro, hematomas en el cuerpo que le duraron dos semanas. Declaró que su hermano no era el mismo de antes, alegre y juguetón, porque siempre estaba distraído, llorando y apenas comía. Que ella le recomendó que fuera a buscar ayuda a un médico. (E.E.P., pág. 5.)
Finalmente, la señora Concepción Corchado declaró que su hermano le dijo que lo habían expulsado de la Policía de Puerto Rico y que no le habían radicado cargos. Que su cuñada siempre se había mantenido junto a su hermano y que antes del incidente, ella era buena ama de casa, alegre y atenta con él y que luego del accidente, estaba deprimida. (E.E.P., pág. 5.)
Luego se presentó el testimonio de la esposa de Juan M. Concepción Corchado, la señora Virginia Rivera Quiara. Esta declaró que entre 9:30pm y 10:30pm del 6 de mayo de 1996, se encontraba en su casa en Carolina cuando su esposo salió a comprar cigarrillos. Que durante el día, su esposo había estado arreglando un carro en la marquesina de su casa y ella le dio dinero para que le pagara al mecánico que vivía más abajo, que estaba arreglando el otro auto que estaba dañado. (E.E.P., págs. 8, 13.)
Unos minutos después que su esposo salió, escuchó unas detonaciones. Su cuñada salió a ver lo que había pasado y ella se asomó al balcón y vio los biombos de una patrulla municipal y dos (2) guardias municipales parados afuera. Salió caminando de su casa con el bebé y al acercarse al lugar, vio a su esposo tirado en el piso, bocabajo. Declaró que vio cuando el agente Látimer levantó a su esposo del piso con las manos atrás. La señora Rivera vio a los guardias municipales Francisco Látimer Alvarado y Samuel Joubert Negrón y les preguntó que pasaba, pero éstos no le dijeron nada. (E.E.P., págs. 8,13.)
Luego vio llegar de dos (2) a tres (3) patrullas estatales por la parte de atrás del parque de pelota y una *838 patralla municipal por la parte de al frente. Posteriormente, siguieron llegando guardias y sacaron a Juan B. Concepción Corchado de la patralla y lo metieron en otra patralla municipal. Cuando lo sacaron de esta patralla municipal, lo tiraron al piso y le dieron una golpiza. Declaró que en todo momento su esposo tenía las manos en la parte de atrás, pues estaba esposado. (E.E.P., pág. 9.)
Mientras agredían a su esposo, la señora Rivera trató de acercarse, pero la guardia estatal Melissa Sepulveda la aguantó y le dijo que se estuviera tranquila, “que él es fuerte y aguanta y ellos están haciendo su trabajo”. Cuando fueron a arrestar a su esposo, el guardia estatal Jimmy Alverio Hernández, le dio un puño a su esposo. Declaró que ella no agredió a nadie durante el incidente, que fue un guardia municipal la que la empujó a ella aun cuando tenía su bebé en los brazos. El guardia municipal Látimer la echó para atrás y le dijo que se quedara ahí y un oficial bien alto con bigote le dio un “cantazo”. Que a su esposo se lo llevaron para la Estación A y ella siguió la patralla con un vecino, su bebé y su cuñada. (E.E.P., págs. 9-10; 12-13.)
Cuando llegó a la Estación A, luego de las 10:00pm, su esposo ya estaba adentro y el teniente Llanos le dijo que tenía que convencer a su esposo de que “soplara”. La señora Rivera le preguntó al teniente Llanos que porqué su esposo tenía que hacerse la prueba de aliento, si él no estaba guiando y éste le respondió que si no lo hacía, lo iban a acusar criminalmente. El oficial Luis Rodríguez le dijo que había tenido que ponerlo a soplar dos (2) veces. Luego lo montaron en la patralla nuevamente y lo llevaron a la Comandancia de la Policía Estatal de Carolina Sur, donde lo encarcelaron aproximadamente a las 12:00am. En la Comandancia de la Policía Estatal de Carolina, le permitieron llevarle una camisa, un pantalón y un abrigo a su esposo. Que mientras estaba allí, observó a varios agentes, entre ellos guardias municipales, entrar a ver a su esposo y que unos salían sorprendidos y otros salían riéndose. La señora Rivera se quedó con el bebé en la Comandancia hasta el otro día por la mañana. (E.E.P., pág. 10.)
Al día siguiente como a las 4:30am, el oficial Heriberto Rodríguez la trasladó junto a su esposo al Hospital de Area de Carolina, donde le dieron medicamentos a su esposo para el dolor y luego lo regresaron a la Comandancia. La señora Rivera estuvo en la Comandancia como hasta las 4:00pm, cuando el teniente Llanos llegó para decirles que iban para el Tribunal de Carolina. (E.E.P., págs. 10-11.)
Al llegar al tribunal, el sargento Pizarra le entregó un papel donde habían registrado lo que tenía la cartera que le habían ocupado a su esposo y ésta le informó que no estaban los $200.00 dólares que ella le había dado para que le pagara al mecánico. En la sala del tribunal le informaron que necesitaba $100.00 para fiar a su esposo y ella los tenía en ese momento, pero le informaron que el tribunal había cerrado, por lo que tenía que ir a Hato Rey para prestar la fianza. (E.E.P., págs. 10-11.)
La señora Rivera declaró que cuando llegaron a Hato Rey a prestar la fianza a donde fueron trasladados en patralla, un fiador le prestó la fianza de $100.00 y le dijo que se quedara con los $100.00, que él resolvía con la Federación de Policías. Luego los llevaron a su residencia en la patralla como a las 12:00am del día 8 de mayo, casi dos (2) días después de los hechos. El sargento Pizarra fue a su casa dos (2) días después y le preguntó por el bebé y por ellos. Además, le entregó la identificación a su esposo y una tarjeta amarilla. Se excusó con ellos y les pidió que no lo demandaran. (E.E.P., pág. 11.)
Según el testimonio de la señora Rivera, luego de regresar a su casa, su esposo no hablaba, no dormía, no comía, siempre estaba triste y se preguntaba “porqué yo”, “porqué a mf \ Trataron de investigar lo que había sucedido y entre los comentarios surgidos decían que su esposo había intervenido con una “tecata”. Declaró que llegaron a pensar que tenían que mudarse porque habían patrullas municipales día y noche, por lo que tenían miedo de salir. (E.E.P., pág. 11.)
La señora Rivera declaró que expulsaron a su esposo de la Policía y ”eso fue lo que lo devastó”, porque la Policía era su vida. Este apeló su expulsión y le dijeron que en lo que apelaba no podía buscar *839 trabajo, por lo que se encerraba en su casa y no salía. No fue hasta un año y medio (IV2) después que lo restituyeron en el empleo. Declaró que trataron de ir a un siquiatra, pero que sólo iban de vez en cuando, porque el plan médico no lo cubría y se les hacía difícil pagarlo, pues ella no trabajaba. Antes del incidente su esposo era una persona íntegra, responsable, respetuoso, honesto, trabajador, buen esposo, cariñoso y amable. Después del accidente, sigue siendo una persona íntegra y responsable, pero se deprime fácilmente y es un poco más reservado. (E.E.P., págs. 11-12.)
La señora Rivera declaró que la semana después de los hechos temía por la vida de su esposo y de su familia, pues recibieron amenazas de los guardias municipales en el tribunal y en un supermercado, en especial del guardia municipal Joubert. La señora Rivera percibió a este último como “parejero’'’ y “altanero”, pues durante los hechos agredió a su esposo, lo empujó y le dijo malas palabras y hasta el final de las vistas demostró mucha hostilidad. Finalmente, la señora Rivera declaró que vio el cristal de la patrulla roto, pero que no fue su esposo quien lo rompió, que no sabe quién lo rompió. (E.E.P., págs. 12-13.)
También prestó testimonio Juan Concepción Corchado, quien es agente del orden público desde el 24 de julio de 1994 y al momento de su declaración trabajaba para la Unidad de Operaciones Tácticas de Carolina. Según el testimonio de Concepción, el día de los hechos estuvo todo el día en su casa con su esposa la señora Rivera, arreglando un carro viejo y se tomó “una que otra cerveza", como máximo dos (2). Como entre 9:00pm y 9:50pm, le dijo a su esposa que iba al mini-market que quedaba cerca de su casa como a cien (100) metros, a comprar cigarrillos. Esta le pidió que le trajera agua para el bebé, y le dio $200.00 para que le pagara al mecánico que les estaba arreglando otro carro. (E.E.P., págs. 14, 22.)
Luego de comprar los cigarrillos y el agua, cuando iba entrando por la calle 414, escuchó un chillido de gomas de un vehículo de motor, le gritaron que se parara y una mala palabra y acto seguido se escucharon dos (2) detonaciones de arma de fuego, por lo cual se tiró al piso como le habían enseñado en la Academia. Acto seguido, levantó la vista y fue entonces que prendieron los biombos de la patrulla, por lo que sintió más calma pensando que eran policías compañeros, que no le causarían daño. (E.E.P., págs. 14-15, 21-22.)
Declaró que observó que del asiento del pasajero de la patrulla municipal se bajo el guardia municipal Látimer empuñando su pistola con la mano izquierda. Del lado del conductor se bajo el guardia municipal Joubert, también empuñando su pistola con la mano derecha. El señor Concepción les preguntó qué estaba pasando y le dijeron que se callara la boca. El guardia municipal Látimer le quitó la cartera de su cintura y él le indicó que ahí estaba sü arma de reglamento, dos (2) magazines y su identificación de policía. Que le ocuparon el arma de reglamento, $200.00 y que en la cartera que tenía en el bolsillo tenía $18.00 en efectivo, la licencia de conducir, la tarjeta electoral y fotos de su hijo. (E.E.P., págs. 14-15, 21.)
Los guardias municipales lo pararon violentamente del piso y le indicaron que estaba arrestado. El guardia municipal le dijo: “Mira a quien tenemos aquí, al amiguito de Andrades, así era que yo te quería coger canto de cabrón”. Cuando lo llevaban a la patrulla municipal, el guardia municipal Látimer a un lado agarrándole el brazo y el guardia municipal Joubert agarrándole la camisa, pudo observar que varios vecinos salían de sus casas a ver lo que estaba pasando. (E.E.P., pág. 15.)
Cuando estaba montado en la patrulla en la parte de atrás con rejas y las puertas que no abrían, observó que seguían saliendo sus vecinos y le decían a los guardias municipales que él era guardia estatal y que era un muchacho bueno. Su esposa había llegado y se le acercó al guardia municipal Joubert con el bebé en los brazos para preguntarle qué estaba pasando y éste le dio un golpe en el pecho. (E.E.P., págs. 15, 21.)
Además, observó que llegaron como cinco (5) o seis (6) patrullas, entre ellas estatales y municipales, por un parque de pelota que estaba al final de la calle. Posteriormente, observó a los guardias estatales Melissa Sepúlveda y al sargento Pizarro, a los cuales conocía de antes, por lo que le tocó el cristal de la patrulla a la *840 agente Sepulveda, le preguntó qué sucedía y le dijo que estaba asustado porque estaban empujando a su esposa y a su hermana. Además, le pidió que protegiera a su familia. (E.E.P., págs. 15-16.)
Concepción declaró que el guardia municipal Joubert abrió la puerta del lado derecho de la patrulla y le dijo que lo iban a llevar al polígono, que allí iban a terminar todo y le dio un puño en la parte posterior de la cabeza. Observó que continuaban empujando a su esposa de forma hostil. Entre los que pudo observar, se encontraban los guardias municipales Joubert, Látimer y Lugo. Mientras él trataba de salir de la patrulla y abrir la puerta, un guardia municipal abrió la puerta de la patrulla y lo golpeó, lo haló por el brazo izquierdo y le rompió la camisa. (E.E.P., pág. 16.)
Después de que le sacaron de la patrulla, en el piso le dieron puños, patadas, rodillazos, lo levantaron del piso y lo tiraron otra vez y lo esposaron en el piso. Declaró que uno de los guardias le puso la rodilla encima de la cabeza y le rasparon todo el rostro. Lo levantaron del piso y lo tiraron encima de una patrulla estatal y rompió con la espalda el espejo retrovisor. Antes de montarlo en la patrulla municipal, el guardia estatal Jimmy Alverio Hernández le dio un puño en el lado derecho de su nariz. Según su testimonio, no puso resistencia al arresto y no pateó la puerta de la patrulla ni rompió el cristal, sino que fueron los guardias cuando le estaban dando la ltpeU\ (E.E.P., págs. 16,21-22.)
Cuando lo montaron por tercera vez en la patrulla municipal, observó que el guardia municipal Joubert y el guardia estatal el sargento Pizarro, discutieron sobre quién se lo iba a llevar en la patrulla. Finalmente, lo sacaron nuevamente de la patrulla municipal y lo llevaron a la patrulla estatal donde le informaron que iban para la Comandancia de la Policía Municipal que era en un polígono, que allí no iba nadie, por lo que pensó que iban a terminar con él y que le iban a dar una paliza igual o peor. (E.E.P., pág. 16.)
Cuando llegaron al polígono, el señor Concepción preguntó nuevamente porqué lo estaban arrestando y el guardia estatal Heriberto Rodríguez le dijo que no sabía. Posteriormente, se lo llevaron a la Estación A y allí le dijeron que le iban a hacer una prueba de aliento, a lo que les indicó que él no estaba conduciendo un vehículo de motor, que estaba caminando y que estaba de vacaciones. Declaró que el teniente le indicó que si no soplaba le iban a someter cargos criminales y el agente Luis Rodríguez le realizó la prueba de aliento. Concepción declaró que la primera vez que sopló la prueba dio .06% y el agente Luis Rodríguez le dijo que se había dañado. Sopló por segunda vez y la prueba dio .18% y el agente Luis Rodríguez le dio un papel para que lo firmara, pero no le dieron copia. (E.E.P., págs. 16-17, 22-23.)
Luego de realizarle la prueba de aliento en la Estación A, se lo llevaron al Precinto de Carolina Sur como entre 10:30pm y ll:00pm y lo encerraron en una celda. Declaró que los guardias estatales y municipales se reían de él en la celda y se sintió abochornado, con miedo y con vergüenza de estar en un precinto donde había trabajado. Trató de hablar con algunas personas, pero nadie le hizo caso. Que como entre 3:00am y 4:00am, el guardia estatal Heriberto Rodríguez lo llevó junto a su esposa y su bebé en la patrulla al Hospital de Área de Carolina, en donde le tomaron placas de la cabeza y recibió tratamientos. En el hospital se sintió abochornado porque allí todo el mundo lo conocía, pues había ido muchas veces como parte de su trabajo como policía a llevar heridos a la sala de emergencias. Luego lo regresaron al Precinto Carolina Sur y lo encerraron otra vez en la celda. (E.E.P., pág. 17.)
El 7 de mayo de 1996, su esposa le llevó ropa y como a las 4:00pm, el guardia estatal Alverio le llevó alimentos y luego se lo llevaron para el tribunal para someterle cargos. En el tribunal de Carolina, un guardia estatal de apellido Verdejo le consiguió un abogado y le sometieron alrededor de siete (7) denuncias, entre ellas resistencia al arresto, daños a la patrulla municipal, alteración a la paz y amenaza. (E.E.P., págs. 17-18.)
En el tribunal de instancia le impusieron una fianza de $1,000.00 o el diez porciento (10%) por el delito grave de resistencia al arresto. Su esposa tenía el diez porciento (10%) y los guardias estatales, el sargento *841 Pizarro y Heriberto Rodríguez, lo llevaron a Hato Rey a prestar la fianza, donde un fiador que lo conocía le prestó la fianza. Luego de prestar la fianza, lo llevaron a su casa. (E.E.P., pág. 18.)
Concepción declaró que en su casa se sentía abochornado y lloró con su esposa. Que como dos (2) días después, el sargento Pizarro fue a su casa y le preguntó por el estado del bebé y de ellos.
Además, le entregó su identificación y les pidió que no lo demandaran, que él había tratado de hacer su trabajo. (E.E.P., pág. 18.) Todos los casos menos graves y el grave por resistencia al arresto se archivaron, pues los testigos alegaron no tener interés. (E.E.P., págs. 18-19, 21.)
El apelado Concepción se encontraba de vacaciones al momento de los hechos y posteriormente estuvo treinta (30) días en tratamiento por los golpes recibidos durante ese incidente. Además, fue desarmado y aunque se le formularon cargos administrativamente, seguía siendo policía. Luego lo expulsaron de la Policía en agosto de 1996, por los cargos criminales que se le sometieron y se vio una vista informal en Carolina con el capitán Eddie Arroyo. En dicha vista testificaron el sargento Pizarro, Melissa Sepulveda, su esposa y su hermana. Se le exoneró de los cargos administrativos, por lo que se le incorporó nuevamente al servicio mediante carta el 17 de octubre de 1997 y oficialmente se reinstaló dos (2) semanas después que fue asignado a prestar servicios en la Academia de la Policía, en lo que lo armaban nuevamente. (E.E.P., págs. 19-20.)
Le devolvieron el arma como cuatro (4) meses después, pues tuvo que tomar unas clases de derechos civiles y tiro al blanco, como requisito después de haber estado fuera del servicio más de seis (6) meses. Cuando le entregaron el arma, lo trasladaron al Precinto de Carolina Sur a tomar querellas, atender el teléfono y a orientar personas. Antes de los hechos, Concepción estaba en la Superintendencia Auxiliar de Policías de la Comunidad (SAPC) orientando a personas y dando vigilancia preventiva en los residenciales públicos, velando porque la incidencia criminal bajara. No lo asignaron nuevamente a este lugar, porque alegadamente el SAPC se eliminó y se convirtió en una Unidad de Impacto. (E.E.P., págs. 19-20.)
Según el testimonio de Concepción, antes de los hechos nunca había tenido problemas personales con los guardias municipales Joubert, Látimer, ni con el guardia estatal Alverio. Luego de los hechos cuando fue reinstalado en el servicio, la relación con sus compañeros era malísima porque muchos de sus compañeros no querían trabajar con él, pues había sido expulsado de la policía y estuvo preso. El día de su declaración, Concepción trabajaba para la División de Operaciones Tácticas y todavía sus compañeros seguían con la misma actitud. Declaró que no ha radicado ninguna querella escrita a sus supervisores por la actitud de sus compañeros, por temor a que tomen represalias en su contra. Le solicitó a sus vecinos que fueran testigos del caso, pero éstos no fueron al tribunal. Constantemente, las patrullas de guardias municipales pasaban por su casa con los biombos prendidos y en varias ocasiones alumbraron su casa y la de sus vecinos con los “spotlights”. Además, las patrullas estatales daban la ronda normal cada hora y media. (E.E.P., págs. 19-20.)
Que antes de los hechos era una persona sumamente atlética, alegre, comunicativa, siempre en movimiento y le gustaba ir al parque, a la playa y al gimnasio. Después de los hechos, ya no es así y que tiene miedo de que la Policía cometa un error igual y otra injusticia con él. Aunque le teme a las personas, cree en el sistema y entiende que cuando se vio la vista administrativa el sistema funcionó. Que llevó el caso porque confía en el sistema y no quiere que otros civiles pasen por lo que él pasó. Además, aún no tiene idea de porqué intervinieron con él. (E.E.P., págs. 20-21.)
Finalmente, Concepción declaró que como tres (3) semanas antes del juicio, estuvo en un operativo donde estuvo la Guardia Municipal y Hacienda y que cuando esta última comenzó a verificar los documentos, el guardia municipal Látimer empujó a una persona encima de una mesa de billar, por lo que él le llamó la atención. Además, en una ocasión se encontraba en el supermercado con su esposa y el guardia municipal Joubert trató de tropezar con él y su esposa lp haló. Joubert le dijo que no pudo coger a Andrades, pero que a él *842 lo tenía “jodio”. (E.E.P., pág. 21.)
La prueba de la parte apelante comenzó con el testimonio del guardia municipal Francisco Látimer Alvarado. Declaró que cuando iban patrullando por la avenida Monserrate de Villa Carolina cerca del negocio “Reymar” como a las 9:30pm con su supervisor el cabo Samuel Joubert, se presentó una señora de tez blanca, de entre 36 a 40 años que vestía una camisa blanca y un pantalón corto de franjas blancas y negras y les hizo una señal para que se detuvieran. La señora les dijo que un individuo la había amenazado con un arma de fuego y le había dicho que era un agente del FBI. Cuando ellos le pidieron más información, alegadamente ella señaló a Concepción que estaba parado en la esquina como a unos cincuenta (50) o setenta y cinco (75) pies de distancia; estaba recostado de la verja mirando lo que sucedía. (E.E.P., págs. 24, 27.)
Luego de la señora identificar a Concepción, el agente Joubert se bajó de la patrulla y Concepción salió corriendo hacia adentro de la urbanización. El agente Látimer declaró que cuando el agente Joubert salió corriendo detrás de Concepción, él le dio reversa a la patrulla para poder entrar a la marginal y cuando estaba entrando escuchó una detonación. El agente Joubert le indicó que el señor Concepción estaba detrás de un vehículo que estaba estacionado. (E.E.P., págs. 24-25, 27.)
Cuando el agente Látimer se bajó del carro, el agente Joubert le estaba dando el alto a Concepción, quien levantó las manos y dijo que era policía, por lo que ellos le indicaron que si era policía conocía el procedimiento y que se tirara al piso para registrarlo. Alegadamente, Concepción se negó y luego de continuar un intercambio sobre el hecho de que éste era policía, por lo que no le podían hacer eso, accedió a acostarse en el piso. El agente Látimer lo registró y le quitó una cartera que tenía en la cintura y en donde tenía una pistola de las que usa la Policía de Puerto Rico y las credenciales de Concepción de la Policía. Este le entregó el arma y las credenciales al agente Joubert. (E.E.P., págs. 25, 27-28.)
Cuando Concepción preguntó qué estaba pasando, le indicaron que estaba detenido bajo investigación, que se estaban querellando en contra de él. Posteriormente, lo llevaron, hasta la patrulla y lo sentaron en la parte posterior. En ese momento, el agente Joubert le indicó que fuera a buscar a la querellante, pues ya estaban llegando las unidades de refuerzo, por lo que el agente Látimer se fue a “Reymar” donde se habían encontrado a la señora y preguntó por ella, pero no la encontró porque le dijeron que al ver las patrañas se había ido. (E.E.P., págs. 25, 27-29.)
Que cuando llegó al lugar de los hechos se percató de que la hermana de Concepción estaba hablando con él por el cristal de la unidad, pero no escuchó lo que estaban hablando. Alegadamente, cuando ella se retiró de la patrulla, Concepción comenzó a darle con los codos a los cristales de la patrulla, con los puños a la reja de la unidad, se acostó en el asiento y con los pies comenzó a darle al cristal posterior del lado del conductor hasta que lo rompió. Para el momento en que el agente Látimer regresó al lugar de los hechos, ya había como siete (7) patrullas, estatales y municipales y había en total entre quince (15) a veinte (20) policías estatales y guardias municipales. Además, el agente Látimer declaró que no vio a la esposa de Concepción ni a su bebé en el área y que no intervino con éstos ni con su hermana. (E.E.P., págs. 25, 29-30.)
El agente Látimer declaró que le dijeron que había que arrestar al señor Concepción, porque había cometido un daño a la propiedad del municipio. Cuando lo sacaron de la patrulla, Concepción se negaba a que lo arrestaran, por lo que alegadamente tuvieron que venir más compañeros a ayudar a controlarlo por lo agresivo que se puso y tuvieron que forcejear con él para poder arrestarlo. Entre sus compañeros guardias municipales que participaron en el forcejeo estaban los agentes Alverio, Lugo y Joubert. (E.E.P., págs. 25-26, 30-31.)
Durante el forcejeo para poder arrestar a Concepción, llegaron hacia otra patrulla, chocaron con ésta y él rompió el retrovisor. Cayeron todos al piso, en donde un compañero le agarró una mano y otro la otra, tratando de ponérselas en la espalda para poder esposarlo. Cuando lograron arrestarlo, lo arrodillaron y lo levantaron del *843 piso para transportarlo a una patrulla de la policía estatal. El agente Látimer admitió que no se le leyeron las advertencias al señor Concepción cuando fue arrestado porque la situación estaba “caldeada”. Además, declaró que luego del forcejeo, Concepción tenía un golpe en el área del pómulo que estaba sangrando, la camisa rota y cree que uno de los bolsillos también estaba roto. (E.E.P., págs. 25-26, 30-31.)
Que durante la intervención, Concepción estaba en una actitud negativa y expedía un fuerte olor a licor, por lo que llamaron a un supervisor para que se hiciera cargo del arma y de las credenciales. Al lugar de los hechos llegaron el sargento Pizarro y el teniente Llanos de la Policía Estatal. Alegadamente, en el lugar de los hechos el teniente Llanos le indicó al agente Látimer que había que hacerle una prueba de alcohol a Concepción porque iban a bregar con él administrativamente. (E.E.P., págs. 26-27, 29-30.)
Luego de arrestar al señor Concepción, el guardia municipal Joubert le indicó al agente Látimer que se fuera al polígono, que se estaban haciendo las gestiones en servicios técnicos para tomarle fotos a la patrulla con daños, por lo que se fue solo en la patrulla. Cuando llegó al polígono de la Guardia Municipal, observó que bajaron a Concepción de la patrulla estatal. Después de que Servicios Técnicos le tomó las fotos a la patrulla, se fueron en otra patrulla hacia la Estación A para hacerle la prueba a Concepción. Declaró que el señor Concepción se negaba a hacerse la prueba de aliento, pero luego accedió a que la efectuaran. (E.E.P., págs. 26-27, 32-33.)
De acuerdo al testimonio del agente Látimer, éste volvió a ver a Concepción cuando lo citaron para la vista en el tribunal, sobre los daños causados a la patrulla. Que firmaron en un papel que no tenían interés en el caso porque se iba a resolver lo de los daños de la unidad y no tenían más interés en seguir con el caso. Después de los hechos, ha visto a Concepción uniformado trabajando y también ha trabajado con él. (E.E.P., págs. 33-34.)
Se presentó además el testimonio de Samuel Joubert Negrón, quien para la fecha de los hechos era cabo de la Guardia Municipal de Carolina. Según su testimonio, como a eso de las 10:00pm, mientras se encontraba en la patrulla conducida por el agente Látimer transitando por la avenida Monserrate, se percató de que una dama les hacía señales para que detuvieran la patrulla. Cuando se detuvieron, la dama les señaló a una persona (Concepción) que estaba parado en la esquina de la marginal y les dijo que ésta la amenazó con que la iba a matar y que era agente del FBI. Que la persona estaba como a unos cincuenta (50) o sesenta (60) pies de la patrulla y éste los estaba mirando. Sin embargo, posteriormente declaró que estaba como a unos ochenta (80) o cien (100) pies. Inmediatamente cuando se bajó de la patrulla, Concepción corrió hacia la urbanización y que él le gritó “cabrón, párate ahf’. Posteriormente, durante su testimonio admitió que el haberle gritado esta obscenidad no fue algo correcto. (E.E.P., págs. 35-36,40-42.)
Que iba corriendo detrás de Concepción como a unos veinte (20) o veinticinco (25) pies y que le hizo un disparo con su arma de fuego de advertencia hacia el suelo y éste siguió corriendo para irse detrás de un carro que estaba estacionado. Admitió posteriormente durante su testimonio, que el disparo tampoco fue adecuado o correcto, pero que lo hizo como advertencia cuando vio que Concepción alegadamente se llevó las manos a la cintura. Declaró que el guardia municipal Látimer llegó en la patrulla y Concepción gritó dos (2) veces que no tiraran que él era policía, a lo que el cabo Joubert le respondió que como quiera saliera con las manos arriba. Cuando salió, le pidieron que se acostara en el piso y Concepción seguía insistiendo en que era policía, a lo que nuevamente le respondieron que como quiera se acostara en el piso para registrarlo. Látimer lo registró y le ocupó una pistola y la tarjeta de identificación de la Policía. Declaró que desde el momento en que comenzó la persecución hasta ese momento no pasaron más de cinco (5) minutos. (E.E.P., págs. 35-36, 39-43.)
Látimer le entregó el arma al cabo Joubert y cuando Concepción se puso de pie, alegadamente le explicaron que había una querella en su contra. En ese momento comenzaron a llegar las patrullas de sus compañeros guardias municipales. Sin embargo, el cabo Joubert declaró que no sabe porqué llegaron las patrullas porque él no llamó por radio ni se comunicó con ellos. (E.E.P., pág. 36.)
*844 Después de montar a Concepción en la patrulla, alegadamente para aclarar la situación y en protección de la seguridad de ellos, el cabo Joubert indicó que se hicieran las gestiones con algún supervisor de la Policía Estatal para que vinieran al lugar, pues había que bregar con él administrativamente. Además, le dijo al agente Látimer que fuera a buscar a la señora que se había querellado. El agente Látimer regresó como a los cinco (5) minutos, le indicó que la señora no aparecía y él no hizo más nada para buscarla. El cabo Joubert declaró que aunque la señora no aparecía, decidió dejar a Concepción en la patrulla porque ya había llamado a la Comandancia de la Policía Estatal y luego de la llamada siguieron llegando patrullas municipales y estatales. Había como de tres (3) a cinco (5) patrullas municipales y como de tres (3) a cuatro (4) estatales. (E.E.P., págs. 36-37,41-42.)
De acuerdo al testimonio del cabo Joubert, aun cuando ya había como de quince (15) a veinte (20) policías estatales y guardias municipales, mientras Concepción estaba en la patrulla se puso jaquetón y agresivo. Posteriormente, llegó al lugar de los hechos la hermana de Concepción y preguntó qué estaba pasando con su hermano y alegadamente el cabo Joubert le explicó que tenía un problema, una situación, y que lo iban a llevar a la Comandancia para resolverlo con calma. Además, le pidió a la hermana que fuera a donde él y tratara de calmarlo. (E.E.P., pág. 37.)
El cabo Joubert declaró que en ese momento llegó el sargento Pizarro y mientras le comenzaba a explicar la situación, escuchó un ruido y un tumulto. Declaró que le informaron que Concepción le había entrado a patadas al cristal de la patrulla y lo rompió, por lo que el cabo Joubert ordenó que lo esposaran y lo arrestaran en ese momento. Sacaron a Concepción de la patrulla para esposarlo y comenzó un forcejeo, pues alegadamente no se dejaba poner las esposas. Durante el forcejeo llegaron a otra patrulla, rompieron el retrovisor y perdieron el balance, por lo que cayeron al suelo. Declaró que vio en el forcejeo a los guardias municipales Alverio, Lugo, Látimer y otros que no recuerda. En ningún momento durante el forcejeo le dieron un golpe a propósito a Concepción; sólo se empleó fuerza para dominarlo. Entre la intervención y el arresto transcurrieron un máximo de veinte (20) a veinticinco (25) minutos. (E.E.P., págs. 37-39, 41-42.)
Cuando lograron arrestarlo, no le leyeron los derechos porque él entendió que como era policía, los tenía que conocer. En ese momento del arresto, el cabo Joubert observó que Concepción tenía una laceración en la cara y otra en la rodilla. En el lugar de los hechos en ese momento había como veinte (20) guardias estatales y municipales y los vecinos mirando. (E.E.P., pág. 38.)
La patrulla estatal en que se llevaron a Concepción, se dirigió al polígono de tiro donde estaba ubicada temporeramente la Comandancia Municipal de Carolina, porque se estaba remodelando la original. Luego el cabo Joubert dialogó con el sargento Pizarro y con el teniente Ortiz para coordinar cómo se iban a someter los cargos. Acordaron que la Policía de Puerto Rico sometería los cargos y la guardia municipal era la perjudicada por los daños a la patrulla y la resistencia al arresto. (E.E.P., pág. 38.)
Como habían decidido radicarle cargos a Concepción, el cabo Joubert declaró que se fue a la Fiscalía de Carolina a entrevistarse con un fiscal. Cuando llegó a Fiscalía como a las ll:30pm o 12:30am, se encontró con el sargento Pizarro explicándole lo sucedido al fiscal, quien luego lo entrevistó y le indicó que sometieran las denuncias. Volvió a ver a Concepción al otro día en la Sala de Investigaciones, cuando fue a radicar dos (2) denuncias por resistencia al arresto, una (1) por daños, alteración a la paz y amenaza. Se determinó causa probable para el arresto por todas las denuncias. (E.E.P., págs. 39-40.)
Según el testimonio del cabo Joubert, éste volvió a ver al señor Concepción en las vistas preliminares en noviembre. Algunos de los casos se cayeron en la vista preliminar y los otros casos que fueron a juicio, él y sus compañeros retiraron los cargos. Alegadamente, el cabo Joubert retiró los cargos porque ya había transcurrido mucho tiempo y él no quería que el señor Concepción se buscara más problemas. Además, el cabo Joubert fue citado para una vista administrativa en la Comandancia de la Policía de Puerto Rico en Carolina, pero desconoce el resultado de la misma. (E.E.P., pág. 39.)
*845 Los demás testigos presentados por la parte apelante corroboraron la versión de los testimonios antes resumidos, los cuales valga señalar, el Tribunal de Primera Instancia no le dio credibilidad. Sobresalen sobre sus testimonios que la policía estatal no está autorizada a hacer disparos con su arma de fuego de advertencias, según declaró la mujer policía Melissa Sepulveda. (E.E.E., pág. 50.) Que los testigos de la parte apelante reconocen que la señora que se querelló contra el apelado Concepción nunca pudo ser identificada y localizada. (E.E.E., págs. 64-68.)
El Tribunal de Primera Instancia emitió sentencia en la cual determinó el porciento de negligencia en un cincuenta porciento (50%) al ELA y el restante cincuenta porciento (50%) al Municipio de Carolina. Los daños fueron estimados en la suma de $120,000.00 al señor Concepción y $20,000.00 a su esposa. (Ap. 2, págs. 33-51.)
Inconforme con dicha determinación, la parte apelante, el Municipio de Carolina, acude ante nos.
II
Expuestos los hechos pertinentes a la controversia ante nuestra consideración, procedemos a exponer la norma jurídica aplicable, conforme los errores alegados.
Alega el Municipio de Carolina, que incidió el foro apelado al determinar que hubo negligencia y además en tal supuesto, al no aplicar la doctrina de negligencia comparada.
No le asiste la razón.
A
Reclamaciones por abuso de autoridad
Bajo las disposiciones de la Ley de Reclamaciones y Demandas contra el Estado, se autoriza a demandar al ELA por acciones en daños y perjuicios, los cuales pueden estar al amparo de la sección 1983 de la Ley Federal de Derechos Civiles, 42 U.S.C. see. 1983.
Para que un demandante pueda prevalecer en una reclamación donde se alegue violación a derechos civiles, se debe probar que los funcionarios del orden público actuaron so color de autoridad, que se le privó al demandante de sus derechos garantizados por la Constitución y que se le causó daños al perjudicado al actuar de manera negligente dichos funcionarios. La responsabilidad del Estado se funda en los actos u omisiones en el desempeño de sus funciones de supervisión de aquellas actividades o personas que se podría preveer causarían daños. Leyva et al. v. Aristud et al., 132 D.P.R. 489, 510-511 (1993).
Se le impone responsabilidad al ELA cuando los funcionarios causen daños por su exclusiva culpa o negligencia al desempeñar sus cargos en su capacidad oficial; cuando sus actuaciones sean preponderantemente negligentes, aun cuando éstas tengan elementos de intención; y cuando el Estado incumple con un deber impuesto por la ley o la Constitución. Leyva et al. v. Aristud et al., supra.
B
El Artículo 1802 del Código Civil y la negligencia comparada
El Artículo 1802 del Código Civil establece que quien por su culpa o negligencia cause daño a otro, tiene el deber jurídico de repararlo. La negligencia del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización. 31 L.P.R.A. see. 5141; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 176 (1996).
Al determinar si existe una causa de acción bajo el Artículo 1802, supra, es necesario que concurran los *846 siguientes requisitos: 1) la existencia de un daño real; 2) culpa o negligencia; y 3) relación causal entre el daño causado y la conducta culposa o negligente. Las Sucesiones de Francisco Vega Marrero y Otros v. A.E.E., opinión de 21 de septiembre de 1999, 99 J.T.S. 145, pág. 63; Cintrón Adorno v. Gómez, opinión de 22 febrero de 1999, 99 J.T.S. 20, pág. 616.
Cuando el perjudicado incurre en responsabilidad, el tribunal debe determinar la fracción de responsabilidad o negligencia de cada parte y reducir la indemnización de conformidad con tal distribución a base de porcientos. Esta doctrina se conoce como la negligencia comparada. Miranda v. E.L.A., 137 D.P.R. 700, 713 (1994); Irizarry Yunqué, Carlos J., Responsabilidad Civil Extracontractual, Tercera Edición, 1998, pág. 378.
C
La revisión judicial
Es norma jurisprudencial reiteradamente establecida aquélla que postula que en el ámbito apelativo no se intervendrá con las determinaciones de hechos y la adjudicación de credibilidad efectuada por el juzgador de los hechos, en ausencia de error manifiesto, pasión, prejuicio o parcialidad. Pueblo v. Acevedo Estrada, opinión de 19 de enero de 2000, 2000 J.T.S. 22, pág. 573; Blás v. Hosp. Guadalupe, opinión de 30 de junio de 1998, 98 J.T.S. 101, pág. 101.
El Tribunal de Primera Instancia es el que tiene la oportunidad de oír y ver declarar a los testigos y apreciar su comportamiento, por lo que está en mejor posición de aquilatar la prueba testifical presentada. Cuando existe conflicto de prueba, le corresponde al juzgador de los hechos dirimirlo. Flores v. Sociedad de Gananciales, opinión de 30 de junio de 1998, 98 J.T.S. 96, pág. 1354; Pueblo v. Rivera Robles, 121 D.P.R. 858, 869 (1988).
D
La aplicación del derecho
Según la prueba que tuvo el Tribunal de Primera Instancia a la cual le dio entero crédito, la parte apelada, en particular Juan Concepción Corchado, fue sujeto a actos en violación a sus derechos civiles que le causaron daños físicos, realizados por la Policía de Puerto Rico y la Guardia Municipal de Carolina, so color de autoridad. Literalmente, según la prueba antes expuesta, el apelado recibió una “paliza” de los funcionarios estatales y municipales de Carolina al ser arrestado.
Llama la atención el hecho que cuando se realizó tal operativo, había aproximadamente veinte (20) agentes del orden público, por lo cual la teoría de la parte apelante que Concepción se tomó agresivo y lo tuvieron que someter a la obediencia, es de poca o ninguna credibilidad, según lo concluyó el foro apelado. Con más razón cuando todos los cargos criminales que se le presentaron en su contra en el tribunal, fueron archivados por falta de interés, y la alegada querellante que dio motivo al arresto nunca fue identificada y localizada.
Tanto los policías estatales como los guardias municipales fueron interactivos y demostraron con sus actos, un menosprecio total a la integridad física de Concepción y sus familiares, agrediéndolo de manera reiterada y reteniéndolo injustificadamente por casi dos (2) días, antes de someter al tribunal loa alegados cargos criminales.
Tales actuaciones demuestran negligencia de los funcionarios de la Policía y la Guardia Municipal, con el deber impuesto por las leyes y la Constitución como lo dispone nuestra jurisprudencia. Ante ello, no procedía el aplicar la doctrina de negligencia comparada.
Por otra parte, la pmeba demostró que en el lugar de los hechos estaban presentes agentes supervisores y oficiales de alto rango tanto de la Policía como de la Guardia Municipal. Que éstos no tomaron ninguna acción afirmativa para evitar los actos de agresión contra Concepción y su familia, además de la dilación injustificada en *847 que se tramitaron los casos ante el tribunal de justicia.
El Municipio de Carolina, al igual que el ELA, son responsables por tales actos negligentes de sus funcionarios del orden público, que le causaron daños a la parte apelada.
Concluimos que el foro de instancia tuvo prueba ante sí que justificó su dictamen y la disposición que hizo del caso fue correcta en derecho y justicia. Por ende, el error alegado no fue cometido.
III
Se alega como segundo error que incidió el foro apelado al valorizar los daños.
Tampoco le asiste la razón.
A
La adjudicación de daños por el Tribunal de Primera Instancia
La responsabilidad civil en daños y perjuicios es el deber de resarcir al damnificado, otorgándole un valor económico por el daño sufrido mediante la compensación. Es una especie de subrogación real donde la compensación económica crea una situación patrimonial equivalente a la destruida por el daño causado. Cintrón Adorno v. Gómez, opinión de 22 de febrero de 1999, 99 J.T.S. 20, págs. 615-619; Pagán v. Shiley Caribbean, 122 D.P.R. 193, 205.
Es principio reiterado por nuestra jurisprudencia que no se intervendrá con la adjudicación de daños por el tribunal de instancia, a menos que la cuantía concedida sea ridiculamente baja o exageradamente alta. Es el tribunal de instancia quien está en mejor posición de tomar la decisión, por lo que el tribunal apelativo debe otorgarle deferencia a la adjudicación de daños realizada por el tribunal sentenciador. López Torres v. González Velázquez, opinión de 6 de junio de 2000, 2000 J.T.S. 90, pág. 1211; Rivera Rodríguez v. Tiendas Pitusa, opinión de 28 de junio de 1999, 99 J.T.S. 107, pág. 1245.
B
Aplicación del derecho
Las circunstancias particulares del caso presentado demuestran sin lugar a dudas que la parte apelada recibió graves daños físicos y a su reputación. En específico, Concepción fue agredido físicamente en varias partes del cuerpo estando en el suelo esposado el día de los hechos, sin justificación alguna. Los funcionarios que realizaron la intervención, no pudieron justificar la legalidad de la misma, pues la alegada querellante nunca pudo ser identificada, ni apareció. Además, Concepción y su familia fueron humillados durante el tiempo injustificado de casi dos (2) días en que estuvo en el cuartel arrestado, sin que se le presentaran los cargos criminales.
Es un hecho incontrovertido que Concepción fue expulsado de la Policía y que tuvo que apelar e impugnar todo ese trámite por casi dos (2) años y durante el mismo, no pudo trabajar para mantener a su familia. Que tuvo que recibir tratamiento psiquiátrico para poder superar la crisis y que tal evento le provocó daños emocionales. Los daños causados a su reputación, según fueron probados, aún persisten, pues recibe el rechazo de sus compañeros policías por tales eventos. Esta prueba robusta y convincente que tuvo el foro apelado ante sí, no fue rebatida.
Bajo la premisa que nuestra intervención en apelación, se limita a si la cuantía concedida fue exageradamente alta o ridiculamente baja, no procede que se altere la misma, pues no hay razón válida para concluir que la compensación concedida no fuera conforme a las circunstancias del caso y los daños probados.
*848 El Tribunal de Primera Instancia tuvo prueba suficiente ante sí sobre los graves daños causados a la parte apelada, por lo cual la adjudicación de los mismos se justifica en derecho.
IV
Por los fundamentos que anteceden, se confirma la sentencia, según sus términos y condiciones.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau Secretaria General